# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MARYLAND

Danilo J. DeSousa
20 East Lanvale Street, #807
Baltimore, Maryland 21202
        Plaintiff,

v.

University of Maryland, Eastern Shore
11868 Academic Oval              Case No.:
Princess Anne, Maryland 21853

SERVE ON:
Brian E. Frosh, Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202

        Defendant.

## COMPLAINT

Plaintiff, Danilo J. DeSousa (hereinafter "DeSousa" or "Plaintiff"), by and through undersigned counsel, hereby files this Complaint against University of Maryland, Eastern Shore, hereafter, ("UMES" or "Defendant"), for unlawful discrimination and harassment in the terms and conditions of Plaintiff's employment based on his sex and unlawful termination of his employment based on his sex and in retaliation for his EEO activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e. *et seq*, as amended (hereinafter, "Title VII"). Plaintiff alleges the following:

## JURISDICTION AND VENUE

1. Jurisdiction over this action is proper pursuant to 28 U.S.C. §1331 and 28 U.S.C.

§1343.

2. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 2000e.-2 and 2000e-5 and 42 U.S.C. §12203(a).

3. Venue in this court is proper because the conduct complained of occurred in the State of Maryland, where the Plaintiff was previously employed.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

4. Plaintiff timely filed a charge of discrimination against Defendant with the Baltimore Field Office of the U. S. Equal Employment Opportunity Commission ("EEOC") – Charge No. 531-2017-00629.

5. The EEOC issued a Dismissal and Notice of Rights ("Notice of Rights") date-stamped September 13, 2019.

6. Plaintiff's Counsel received the Notice of Rights on September 16, 2019, after which the instant action was timely filed within ninety (90) days of the receipt of the aforementioned Notice.

7. Plaintiff has exhausted his federal administrative remedies as to the allegations of this Complaint.

**PARTIES**

8. Plaintiff Danilo J. DeSousa, who is male, is a citizen of the United States and an adult resident of the State of Maryland. During all times relevant to this complaint, DeSousa was an employee of Defendant University of Maryland, Eastern Shore as defined under Title VII, 42 U.S.C. §2000 et seq.

9. Defendant University of Maryland Eastern Shore is a constituent of the University System of Maryland and a historically black, 1890 land-grant institution. UMES was DeSousa's "employer" for purposes of Title VII, 42 U.S.C. §2000 et seq.

**FACTUAL ALLEGATIONS**

10. Prior to accepting employment at UMES, DeSousa had 22 years of higher education administration experience, including positions as provost, chief and academic affairs officer, student affairs officer, enrollment management officer, and retention officer.  Stephen McDaniel ("McDaniel"), then UMES's Vice President for Institutional Advancement, contacted DeSousa and informed him about the search by UMES to fill the position - Vice President for Student Affairs & Enrollment Management.  McDaniel was chairing the search committee overseeing the hiring for this position.  At that time, Plaintiff was the Assistant Vice Chancellor for Student Retention at Fayetteville State University.

11. After thoughtful consideration of this opportunity, DeSousa applied and was hired through an expedited hiring process.  He met then UMES' President, Juliette B. Bell ("Bell") shortly before his hire, which was effective April 20, 2015.

12. As Vice President for Student Affairs and Enrollment Management, and all times relevant to this lawsuit, DeSousa reported directly to the University President, then Juliette Bell ("Bell" or "Dr. Bell"), and had responsibility for providing leadership and direction in coordinating, implementing and evaluating the UMES's strategic recruitment and retention initiatives, managing, assessing and implementing strategies designed to achieve Defendant's enrollment management

goals, improving student educational outcomes, and enhancing UMES's visibility and public image.

13. In the summer of 2015, shortly after he was hired, DeSousa met with and obtained approval from Dr. Bell to staff his Division as he deemed necessary to execute the action steps required to achieve the goals and objectives integral to his role and responsibilities.

14. To that end, Plaintiff recommended promoting four incumbent female employees and recommended the temporary (interim) hiring of three, male applicants. Human Resources vetted and approved the promotions and hires, each of which also was approved by Dr. Bell who had final and sole authority for these recommendations consistent with the University of Maryland System Board of Regents' policy.  Further, two additional male candidates, recommended for hire by another staff member, were vetted and approved for hire by Human Resources, with Dr. Bell's authorization.

15. In or around November 2015, Dr. Bell called DeSousa to her office and told him she was concerned he was hiring "young boys" to fill the interim positions. During this meeting, Bell instructed DeSousa to terminate one of the interim hires but gave no reason.  Plaintiff later learned from the Provost, who also was in attendance at this meeting, that there was rumor circulating that DeSousa and the individual whom President Bell instructed him to terminate were lovers.  This rumor was not true and DeSousa made this clear to the Provost.

16. Additionally, in the November 2015 meeting Dr. Bell told Plaintiff she did not want to hurt his career and asked him if he wanted to resign.  Unclear as to

4

why he should even think about resigning, DeSousa rejected this suggestion that he even consider resigning.

17. DeSousa was offended by the inference that his hiring recommendations had been influenced by inappropriate, predatory motives. That notwithstanding, he offered to provide Dr. Bell an action plan to address her stated concern that the interim hires were inappropriate even though each had been vetted by Human Resources.

18. After DeSousa presented the action plan to Dr. Bell, he did not receive any feedback and believed the matter had been addressed to her satisfaction.

19. On or about December 18, 2015, DeSousa received an email informing him of the need to meet with UMES's Title IX Coordinator and Equity Compliance Officer, R. Hardy Rudasill ("Rudasill"), to discuss the findings of "Equity Complainants" stemming from his Division.

20. On December 19, 2015, Plaintiff sent an email to the Director of Human Resources, Marie Billie ("Billie"), and Dr. Bell expressing concern that two of the interim hires – both males - had been the subject of repeated questions regarding their marital status and/or asked to share pictures of their spouses and/or children. In the email, DeSousa expressed concern about the unfair targeting and treatment of the two men and his desire to create a sense of well- being and a supportive work environment. Neither Bell nor Billie responded to his concerns.

21. In January 2016, DeSousa met Rudasill and Billie to review the interim hires in his Division. None of the hiring or promotion decisions were changed following that meeting, nor was DeSousa informed he had violated any law or UMES

policy relative to the interim appointments or promotions that were the basis of the complaints investigated by Rudasill's office.

22. Around the same time he was working with Rudasill and Billie to address the "complaints" regarding his Division, DeSousa received a phone call from a colleague who worked at another institution of higher learning. That colleague shared with Plaintiff that the rumor mill in higher academia was that "he was over at UMES hiring young boys who were gay". And another professional acquaintance informed Plaintiff that these allegations had been and were being circulated and discussed both within and outside the walls of UMES . DeSousa made it clear to both his colleague and the professional acquaintance that these rumors were not true.

23. In February 2016, Bell met with DeSousa and informed him the "Title IX complaint against him" had "merit" and as a result she had decided to remove enrollment management from his scope of responsibilities. In a campus-wide email, Bell communicated this decision to the UMES' community the following week. The unsolicited feedback Plaintiff received made it clear the removal of the student enrollment duties was viewed as a demotion for misconduct or some other dereliction of duty.

24. In or about February 2016, Bell also overturned a decision made by DeSousa that one of his female subordinates had abused her authority by implementing changes to a provision of UMES's National Pan-Hellenic Council's Constitution in a manner that was inconsistent with explicit language in the Constitution. Bell offered DeSousa no opportunity to discuss this matter or provide an explanation for her decision to intervene and thereby undermine his authority.

25. In March 2016, DeSousa through legal counsel wrote Bell to request that she reconsider the decision to remove enrollment management from his responsibilities. In that letter, Plaintiff also asserted he felt he was being subjected to an unlawfully hostile work environment based on what others perceived to be his sexual orientation.

26. In UMES's response, dated April 4, 2016, it informed DeSousa that the decision to remove enrollment management was not related to any Title IX matter investigated by Rudasill, but instead an exercise of Bell's discretion as President to make administrative changes. Defendant did not address in its response Plaintiff's claim that he was being subjected to a hostile work environment.

27. Prior to removal of the enrollment management responsibilities, DeSousa managed the team that helped UMES reach an enrollment peak in the fall 2015 that it had failed to accomplish in recent previous years. After student enrollment was removed from his oversight, UMES experienced considerable declines in student enrollment.

28. On April 4, 2016, the same date of Defendant's written response to Plaintiff regarding his request to reconsider the removal of enrollment management from his responsibilities, Plaintiff was informed by Bell's secretary that two leave requests he previously submitted had been denied. Specifically, Plaintiff had been invited to travel to the University of Dayton during the week of April 4, 2016 to participate as a co-presenter at a national conference, followed by an invitation to be a keynote speaker for an event at University of Notre Dame. The reason given for denying leave that week never was explained.

29. Having already committed to attend each of these events because he viewed them as opportunities to promote UMES, DeSousa was forced to rescind acceptance of the invitations although his involvement in each event already had been confirmed. Plaintiff was deeply embarrassed and profoundly humiliated as a result; and also lost the opportunity to receive a $3,000 honorarium associated with those engagements.

30. Also in April 2016, Bell summoned DeSousa to her office to question and ultimately deny his request to utilize High Impact Practices ("HIP") resources for a safe space retreat in Deep Creek Maryland, sponsored by the Lesbian, Gay, Bi-Sexual, Transgender, and Queer (LBGTQ) student group. THE HIP resources came from grant funds awarded by the Maryland Higher Education Commission (MHEC). The primary purpose of the MHEC grant was to make UMES "competitive" and "comparable" to other institutions of higher education in and outside Maryland. DeSousa was responsible for overseeing administration of MHEC grant funds set aside for his Division and from which HIP-sponsored programs could be funded.

31. Having previously recommended Deep Creek as a retreat destination to the co-ed Student Government Association (SGA), DeSousa did the same for the LGBTQ group. The SGA retreat was approved. The LGBTQ group could not find an advisor for the overnight experience like SGA, so DeSousa volunteered as the University official. The request for grant funding of the LBGTQ event had been submitted through the proper channels.

32. Dr. Bell summarily denied approval of the LBGTQ group's retreat request and cited the dangers of camping; and, although DeSousa informed Bell that

SGA participated at the same location without incident, she still denied the request submitted on behalf of the LGBQT group.

33. Dr. Bell had not rejected any other HIP-related trips at locations that are documented through crime reports as dangerous to include New York City and New Orleans; and she <u>never</u> had summoned DeSousa prior to submission of this request to question him about or ultimately deny any other HIP educational-travel trips.

34. Also, DeSousa was the only member of Bell's Cabinet who was required to make a PowerPoint presentation regarding how he intended to use MHEC grant funds for non HIP-related activities. The Cabinet members were then allowed to vote on whether DeSousa's proposal should be approved. Bell did not require any other member of her Cabinet to follow this process.

35. On or about April 25, 2016, Bell verbally informed DeSousa he would be placed on a Performance Improvement Plan (PIP). More than 1 month later, May 27, 2016, Dr. Bell provided DeSousa with a written PIP.

36. Also in May 2016, Bell issued DeSousa a written disciplinary warning alleging he had violated the Family Educational Rights and Privacy Act (FERPA) resulting from his involvement in an incident in which a female student alleged she had been sexually assaulted. Prior to issuing the disciplinary warning, Bell had not spoken to Plaintiff about the incident to get his account of the events.

37. On June 10, 2016, Bell sent Plaintiff an email in which she informed him that it had come to her attention that he had received and "may be acting upon" a Title IX action appeal from a UMES student in violation of policy. Dr. Bell went on

to state the email was Plaintiff's notification that such behavior is a violation of university policy and would not be tolerated, and also was a failure to comply with the requirements detailed in his PIP.  Baffled by the factually inaccurate allegations and summary determination that he had violated the Title IX policy, DeSousa sent two email responses in which he explained that he had followed the policy and had only reiterated to the student what was expressly published in the Title IX Policy regarding the basis for an appeal.  Bell never responded to Plaintiff's detailed explanation rebutting the charges.

38. The next day, Plaintiff submitted a written rebuttal dated June 11, 2016 to the written warning issued in May.  In it, along with laying out his involvement in the matter, DeSousa detailed conduct by a female employee involved in the same incident, which conduct raised serious ethical violations committed by that employee.  Plaintiff's account of the events, corroborated by others including the student victim, were not investigated and Bell took no action in response to the ethical violations by the employee outlined in Plaintiff's response.

39. DeSousa submitted a status report to Dr. Bell related to his PIP on July 18, 2016.

40. On July 21, 2016, Bell met with DeSousa and informed him of her decision to terminate his employment based on her determination that his performance had not improved during the PIP period.  Approximately one month before DeSousa's termination, a professional colleague of his had been informed during a meeting unrelated to Plaintiff, that Plaintiff was going to be fired if he had not been already.  The person who shared with information with DeSousa's

colleague worked in a different Division and was not a member of the President's Cabinet.

**COUNT I**
**Violation of Title VII**
**(Harassment and Disparate Treatment and Termination Based on Sex)**

41. Plaintiff incorporates by reference paragraphs 1 through 40 of the Complaint as if set forth fully herein.

42. Title VII of the Civil Rights Act prohibits an employer from discriminating against any individual with respect to the individual's terms, conditions, or privileges of employment because of the individual's gender and/or perceived acceptable social norms based on gender and/or sexual orientation.

43. At all pertinent times, Defendant was an employer subject to the provisions of Title VII.

44. At all times pertinent, Plaintiff was an employee entitled to protection under Title VII.

45. At all times relevant to this lawsuit, Defendant, through Bell, unlawfully harassed Plaintiff based on his sex and Bell's perception that he was gay.

46. At all time relevant to this lawsuit, Defendant through Bell treated Plaintiff differently and more harshly than female and heterosexual male employees who reported directly to Bell and violated University Policies with impunity.

47. Defendant, by and through Bell -its agent, knowingly and intentionally subjected Plaintiff to unlawful discriminatory treatment when Defendant significantly diminished Plaintiff's position, denied Plaintiff's leave requests, subjected Plaintiff to disciplinary actions in disregard of the facts, and placed

plaintiff on a performance improvement plan for alleged performance deficiencies for which female and heterosexual male employees who were similarly situated did not receive similar responses.

48. Defendant, by and through Bell- its agent, knowingly and intentionally subjected Plaintiff to unlawful disparate treatment when Defendant terminated Plaintiff for alleged performance deficiencies

49. The reasons articulated by Defendant for its actions are pretext, and Defendant is liable for the unlawful treatment motivated by Plaintiff's sex.

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendant:

A. Finding that Defendant violated Title VII;

B. Awarding Plaintiff all accumulated lost past and future wages and benefits, including back pay, front pay, and interest, and the amount sought exceeds $75,000;

C. Awarding Plaintiff compensatory and consequential damages for pecuniary and non-pecuniary losses, including prejudgment and post-judgment interest, and the amount sought exceeds $75,000;

D. Awarding Plaintiff reasonable attorneys' fees, expert fees, and costs; and,

E. Awarding Plaintiff any other relief the court deems just and proper.

## COUNT II
### (Retaliation in Violation of Title VII)

50. Plaintiff incorporates herein as though fully set out the assertions contained in paragraphs 1-49 of the Amended Complaint.

51. After Plaintiff complained to Defendant in December 2015, that two of his male subordinates were being unfairly targeted based on their sex and the erroneous perception they were gay, Defendant initiated an investigation against Plaintiff related to hiring decisions that were vetted and approved by Human Resources.  Based on this "investigation", Plaintiff's role was significantly diminished.

52. After Plaintiff complained to Defendant in March 2016, that he was being subjected to a hostile work environment based on Bell's perception that he was gay, Defendant denied leave requests, placed him on a performance improvement plan, disciplined him, denied grant funds he requested as the administrative sponsor for an LGBTQ retreat, and ultimately terminated his employment.

53.  But for Plaintiff's sex and Defendant's perception that he was gay, these job actions would not have been taken, as Bell treated similarly situated female and heterosexual male staff differently and more favorably than Plaintiff.

54. Defendant knowingly, wantonly, intentionally and with conscious disregard of Plaintiff's rights, engaged in unlawful retaliation by its actions.

55. As a result of Defendant's unlawful actions, Plaintiff has suffered economic and non-economic damages including but not limited to lost wages and bonuses, embarrassment, loss of status, medical expenses, emotional distress, attorneys' fees and costs related to this litigation.

   WHEREFORE, Plaintiff prays for judgment against Defendant for all damages available under the law, including back pay, pre-judgment interest, front pay,

compensatory damages, punitive damages, reasonable attorneys' fees, costs herein expended and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all counts.

Respectfully submitted,

\_\_\_/s/_____
Pamela L. Ashby, Esquire (Bar # 13689)
Jackson and Associates Law Firm, LLC
1300 Caraway Court, Suite 100
Upper Marlboro, MD 20774
Office: (301) 883-0800
Facsimile: (301) 883-0801
pashby@jacksonassociateslawfirm.com
Attorney for Plaintiff